963 F.2d 368
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Mohamed Khaled KHALAF, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Abed Subhi ABUSAYED, a/k/a Sam Jefferson, Defendant-Appellant.
 Nos. 91-5093, 91-5094.
 United States Court of Appeals,
Fourth Circuit.
 Argued: February 7, 1992
Decided: May 28, 1992
 
 Appeals from the United States District Court for the Eastern District of North Carolina, at Wilmington. James C. Fox, Chief District Judge. (CR-90-38)
 Argued: Edwin Chrisco Walker, Assistant Federal Public Defender, Raleigh, North Carolina; William H. Dowdy, Wilmington, North Carolina, for Appellants.
 John Samuel Bowler, Assistant United States Attorney, Raleigh, North Carolina, for Appellee.
 On Brief: Margaret Person Currin, United States Attorney, Raleigh, North Carolina, for Appellee.
 E.D.N.C.
 AFFIRMED.
 Before MURNAGHAN and HAMILTON, Circuit Judges, and OSTEEN, United States District Judge for the Middle District of North Carolina, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Abed Abusayed and Mohamed Khalaf appeal their convictions of conspiring to commit wire fraud and 37 counts of wire fraud under 18 U.S.C. §§ 371, 1341. These convictions arose from a scheme whereby the defendants placed thousands of international phone calls without paying the bills for those calls. The defendants were jointly tried. Khalaf appeals on the ground that the trial court erred in refusing to grant a new trial based on newly discovered evidence. Abusayed appeals on the grounds that the trial court improperly admitted "other crimes" evidence under Fed. R. Evid. 404(b), that the evidence was insufficient to convict him of the crimes with which he was charged. Finding no error, we affirm the convictions of both appellants.
 
 
 2
 * In September 1990, Abusayed and Khalaf traveled to Wilmington, North Carolina. Abusayed inspected a small one-room office at the rear of 107 South Front Street. He told the manager of the building that he was involved in the telemarketing of cosmetics and signed a one-year lease under a fictitious name.
 
 
 3
 Shortly after taking possession of the premises, the defendants ordered multiple line phone service from Southern Bell. Each phone line was enabled with three-way conference call capacity. From the beginning of October 1990 until October 25, 1990, the defendants placed 5,417 long distance calls predominantly between the hours of 2:00 a.m. and 6:00 p.m. The calls were mainly to: Jordan, Qatar, Saudi Arabia, The United Arab Emirates, and Arab areas of Israel. The defendants typically placed a call to Israel and then connected, via the conference call capacity, several other calls to other Arab countries. The purpose of such an arrangement was to allow Arabs in Israel to speak to other Arabs in middle eastern countries. Such communications were prohibited by law in Israel; however, the act of placing the calls was not illegal in the United States. Witnesses testified that it was primarily Khalaf who was in the Wilmington office, and that Abusayed appeared occasionally, apparently to check on the operation.
 
 
 4
 Tipped off by investigators with AT & T who were investigating the failure of customers at other locations to pay for calls placed to these countries, the FBI set up a surveillance of the office at 107 South Front Street. On the morning of October 25, the FBI followed Khalaf as he exited the office in his vehicle. Apparently, Khalaf spotted the tail and attempted to identify who was following him by blocking one of the FBI's cars in a parking space. Khalaf was subsequently followed by a second vehicle to a rooming house in nearby Carolina Beach. The surveillance continued there until the afternoon. At some time in the afternoon, the defendants were observed packing their belongings into their vehicles, cleaning up, and stopping at various locations to confer with one another. The phone technician who installed the phones at 107 South Front Street was called to the surveillance sight, and he identified the defendants as the individuals he saw in the office when he installed the phones. As the defendants were heading out of town, they were arrested.
 
 
 5
 After a warrant was obtained, the agents discovered five telephones in the car. When the one-touch dialing memories of the phones were checked they were found to have a series of phone numbers in middle eastern countries. Also discovered were several notebooks used for recording the phone calls.
 
 
 6
 At trial, Abusayed's girlfriend testified that although she had no knowledge of Abusayed's illegal activities, Abusayed told her the two were on their way to set up a new office in Raleigh. Evidence of prior similar incidents was also heard at trial. In Chicago, Illinois, Abusayed leased a small office and operated his phone call placement service until he received the bill. He then left Chicago without paying. Khalaf was not connected to the Chicago location and the district court read a limiting instruction to the jury that evidence concerning this location could not be considered against Khalaf. An employee of the landlord of the Chicago location testified that she saw Abusayed there several times a week during May 1990, and that it was Abusayed who paid the rent.
 
 
 7
 Abusayed also set up identical operations in two locations in St. Louis, Missouri. At the first location in Ellisville, a division of St. Louis, Khalaf was tied into the scheme. On August 2, 1990, tenants across the hall from Abusayed's operation erroneously reported that a burglary might be taking place in the space rented by Abusayed. The St. Louis police investigated and found Abusayed and Khalaf in the office on August 2, 1990. They noted that the office was meagerly furnished and had a bank of phones. After receiving confirmation that Abusayed had a valid lease, the police left. With regard to the second St. Louis location at St. Ann, a St. Louis county detective and a long distance phone company (MCI) investigator both testified that Abusayed was present at the St. Ann location on August 31, 1990. They noted this office was sparsely furnished, with several phones and a few notebooks. Khalaf was not tied to the second St. Louis location, and the district court read a limiting instruction to the jury concerning the use of that evidence only against Abusayed.
 
 
 8
 Witnesses from MCI and Illinois Bell Phone Company testified that the phone bills from all these locations were unpaid. These same witnesses testified that the service was ordered in Abusayed's name or a name he was known to use as an alias. Bank employees for Wachovia Bank testified that wire transfers of money were deposited in Abusayed's account from the same countries to which calls were placed from the phone operations in St. Louis, Chicago and Wilmington.
 
 
 9
 Defense counsel for both defendants entered timely objections to the admission of all three of these prior incidents on the assertion that they were inadmissable under Fed. R. Evid. 404(b) and 403.
 
 
 10
 Khalaf denied having any knowledge that the phone bill was not going to be paid or that he had any responsibility to pay those bills. He admitted to lying about the nature of the business being conducted, but claimed that this was solely on the instructions of Abusayed.
 
 
 11
 While Abusayed's counsel was closing, Abusayed announced to Khalaf's counsel that he was willing to testify that Khalaf knew nothing of the phone bills and that it was not his responsibility to pay those bills. Khalaf's counsel moved to reopen trial to admit this testimony. The district court denied this motion. The district court also denied a subsequent motion for a new trial based on Abusayed's willingness to testify.
 
 II
 
 12
 Khalaf appeals his conviction on the ground that it was error to deny him a new trial based on Abusayed's willingness to testify in Khalaf's behalf. Denial of a motion for new trial is upheld on review absent an abuse of discretion by the trial judge. Sloan v. Colebank, 304 F.2d 668 (4th Cir. 1962). In considering Khalaf's motion for new trial, the district court utilized the five-part test elucidated in United States v. Chavis, 880 F.2d 788, 793 (4th Cir. 1989). However, we note that if the motion for new trial is made within the seven-day period following trial, or any extensions thereof, the appropriate test to be applied is the "interests of justice" standard. United States v. Mitchell, 602 F.2d 636, 639 (4th Cir. 1979); 3 Charles A. Wright, Federal Practice and Procedure § 557 at 316 (1982) ("[I]f the motion [for new trial] is made within seven days after verdict or finding of guilty it is to be granted if it is in the interest of justice to do so, and the more onerous restrictions on later motions [after the seven-day period] do not apply."). Only if the motion is made after that time, and before two years elapse, is the five-part Chavis test applied to determine if a new trial based on newly discovered evidence can be granted. Id.; United States v. Chavis, 880 F.2d 788 (4th Cir. 1989). It is undisputed that Khalaf made a timely motion within the extension of the seven-day period for filing. Khalaf did not argue, however, either to this court or to the district court, that the incorrect standard was applied. Although we need not address this issue on appeal, we note that under either standard, Khalaf is not entitled to a new trial. See United States v. Foster, 711 F.2d 871 (9th Cir. 1983), cert. denied, 465 U.S. 1103 (1984) (refusing to grant new trial when trial court incorrectly used the more stringent test when the correct standard was "in the interests of justice," because the defendant failed to object to the standard used by the trial court).
 
 
 13
 In Mitchell, based on the "interests of justice" standard, we remanded to the district court to hold a hearing on the new evidence because it "infused a doubt into the finding of appellant's guilt...." Mitchell 602 F.2d at 637 (new witness effectively admitted he was guilty of the crime with which the defendant was charged). We do not see a similar infusion of doubt here, and an examination of applicable case law demonstrates that it would not be in the interest of justice to grant a new trial in this case.
 
 
 14
 Courts are rightfully skeptical of statements by defendants exculpating a codefendant when their own fate is sealed. See United States v. Metz, 652 F.2d 478 (5th Cir. 1981); United States v. Alejandro, 527 F.2d 423 (5th Cir.), cert. denied, 429 U.S. 844 (1976). Motions for new trial are not favored and should be sparingly granted. Charles A. Wright, Federal Practice and Procedure § 557 (1982).
 
 
 15
 The circumstances under which Abusayed offered to testify in Khalaf's behalf tend to discredit his proposed testimony. Abusayed offered to testify in Khalaf's behalf during closing arguments, and although this offer was not made after trial, as in Metz and Alejandro, it was still at a point where his trial was essentially concluded. It was, therefore, unlikely that his testimony could be used against him. Abusayed had little to lose by his eleventh-hour offer to exculpate his coconspirator. Also, Abusayed himself lacks credibility. The evidence against him concerning the conspiracy to defraud the phone companies was extensive, yet in his affidavit, in which he seeks to exculpate Khalaf, he continues to state that he was running a"legal business" and "had no intent to defraud the phone company." (Appellant's Aff. J.A. 727). Abusayed frequently used aliases and misled authorities, landlords and his girlfriend as to the nature of his activities. His testimony, the evidence, and his affidavit demonstrate his lack of credibility.
 
 
 16
 Furthermore, the evidence against Khalaf, though circumstantial, belies the contention that he was innocently involved. He was present at the fraud location in Wilmington, and practically ran that operation single handedly. He was also tied into one of the previous fraud locations in St. Louis. He behaved suspiciously when he discovered the FBI was tailing him and claimed a lack of memory at trial when questioned about that incident. It was Khalaf who placed most, if not all, of the international calls in Wilmington. He was plainly aware that the calls were billed by the phone company. He obviously knew that Abusayed was conducting his business in a highly suspicious manner, in obscure locations over short periods of time, yet Khalaf denies any curiosity or knowledge of the scheme. Khalaf's bachelor's degree in engineering and his age, thirty, both refute any contention that he was misled or ignorant of the circumstances.
 
 
 17
 Lastly, this case is simply not on par with decisions of other courts applying the "interests of justice" standard to motions for new trial based on newly discovered evidence. United States v. Mitchell, 602 F.2d 636 (4th Cir. 1979) (witness who had not been charged incriminated himself and testified that defendant had nothing to do with the crime); In Re United States, 598 F.2d 233 (D.C. Cir. 1979) (A juror failed to disclose in voir dire, despite a direct question, that her father was fired by the defendant's company); Benton v. United States, 188 F.2d 625 (D.C. Cir. 1951) (The mother of alleged molestation victim testified she did not believe daughter was molested, and offered evidence contrary to daughter's testimony); United States v. Schartner, 285 F. Supp. 193 (E.D. Pa. 1967) (The actual criminal admitted guilt and testified that the charged defendant was not even present. Also, a person present during the crime testified that a government witness misidentified the defendant and other evidence in the case placed the defendant several miles away at the time of the crime).
 
 
 18
 Based on the above analysis, a new trial in this case would not be in the interests of justice; Abusayed's testimony simply does not infuse a doubt into Khalaf's guilt.
 
 
 19
 Using much of the same analysis, Khalaf is likewise not entitled to a new trial under the five-part test in Chavis . The five requirements for granting a new trial based on newly discovered evidence under Chavis, 880 F.2d at 793, are:
 
 
 20
 1.Is the evidence, in fact, newly discovered?
 
 
 21
 2.Are facts alleged from which the court may infer due diligence on the part of the movant?
 
 
 22
 3.Is the evidence relied upon not merely cumulative or impeaching?
 
 
 23
 4.Is the evidence material to the issues involved?
 
 
 24
 5.Would the evidence probably result in acquittal at a new trial?
 
 
 25
 Even if we could accept that the first four questions could be answered affirmatively, it is clear that this additional evidence would not probably result in acquittal at a new trial. As noted above, Abusayed's testimony inherently lacks credibility and there is substantial other evidence upon which Khalaf could be convicted. Granting of a new trial under the Chavis test would, therefore, also be inappropriate.
 
 III
 
 26
 Abusayed alone appeals on the grounds that the district court was in error in admitting evidence of prior bad acts under Fed. R. Civ. P. 404(b). It is within the discretion of the district court to admit evidence of other crimes or acts under 404(b). United States v. Masters, 622 F.2d 83, 87 (4th Cir. 1980). The district court's decision to admit such evidence is upheld absent an abuse of that discretion. United States v. Hadaway, 681 F.2d 214 (4th Cir. 1982).
 
 
 27
 At trial, the district court admitted evidence that Abusayed conducted the same operation in Chicago and at two locations in St. Louis. Abusayed claims that this evidence served no purpose other than to prejudice him and it was not relevant to the operation in Wilmington.
 
 
 28
 We have consistently held that Rule 404(b) is considered to be a rule of inclusion. Id. So long as the evidence is relevant for some purpose other than to show the character of the accused and its probative value is not substantially outweighed by unfair prejudice, it is admissible. United States v. Masters, 622 F.2d 83 (4th Cir. 1980). One of the acknowledged grounds upon which other crimes evidence is admitted is to show intent or knowledge. United States v. Sparks, 560 F.2d 1173 (4th Cir. 1977) (the holding generally equates knowledge with intent); Charles A. Wright, Kenneth W. Graham, Federal Practice and Procedure, § 5242 (1978). In this case, the government clearly must prove intent. See United States v. Burke, 738 F.2d 1225, 1229 (11th Cir. 1984) (Defendant's plea of not guilty to a conspiracy charge puts intent in issue.). Intent is also in dispute because the defendants were only charged with crimes arising out of their operation in Wilmington and they were arrested before the telephone bill related to the Wilmington operation was even due. The fact that the defendant previously engaged in identical conduct and failed to pay the bill was highly probative of intent.
 
 
 29
 Another acknowledged ground to admit prior acts under 404(b) is to show a common plan or scheme. Wright, supra, § 5244. Evidence that Abusayed was repeatedly "skipping out" on paying for the long distance service shows that he was engaged in an ongoing plan of defrauding the phone company, and that the operation in Wilmington was a part of this plan. Abusayed's plan was clearly to go from location to location, using aliases and keeping ahead of the bills in order to avoid paying for the long distance calls.
 
 
 30
 The district court must also balance the probative value-relevance, reliability and necessity-of the evidence against its prejudicial effect. Hadaway, 681 F.2d at 217 (citing Fed. R. Evid. 404(b)). As in Hadaway, there is little doubt that the prior identical conduct of the defendant was highly relevant and made it"significantly more probable that he knowingly aided and abetted the commission of the crime charged...." Id. Evidence of this plan to defraud the long distance phone companies is relevant because it clearly shows that Abusayed was engaged in the crime of defrauding the long distance phone company in Wilmington. The evidence is clearly reliable. It consisted of disinterested eyewitnesses observing Abusayed at the locations in St. Louis and Chicago. Records of the long distant carriers show numerous unpaid calls from these locations of the same type that were placed at the Wilmington location. As to necessity, intent and knowledge were clearly in issue, particularly since the defendants did not fail to pay the long distance bill for the Wilmington operation before it was due.
 
 
 31
 Given the wide discretion of the trial court, and the acute relevance of the prior acts of Abusayed, the district court's determination that the prejudicial impact did not outweigh the prejudice to Abusayed cannot be disturbed. Prior evidence of Abusayed's conduct was clearly admissible to show intent and common plan. This evidence was properly supported by testimony. As such, the district court's decision was not an abuse of discretion.
 
 IV
 
 32
 The last issue raised by Abusayed is whether the government fatally varied its proof from the charged crimes and whether the relevant proof of the charged crimes was sufficient for a jury to find Abusayed guilty. If either of these contentions is correct, the district court should have granted a motion for judgment of acquittal. In reviewing the decision of the district court to deny a motion for judgment of acquittal, the record as a whole is examined, United States v. Young, 568 F.2d 588 (8th Cir. 1978), and the evidence is deemed to support a conviction if there is sufficient evidence from which a reasonably minded jury could find the admissible evidence sufficient to support a finding of guilty. See, e.g., United States v. Artuso, 618 F.2d 192 (2d Cir.), cert. denied, 449 U.S. 861 (1980); United States v. Buras, 633 F.2d 1356 (9th Cir. 1980); United States v. Hall, 632 F.2d 500 (5th Cir. 1980); United States v. Patterson, 644 F.2d 890 (1st Cir. 1981).
 
 
 33
 Abusayed first contends that the government failed to provide evidence from which the jury could find the "essential elements of the crime beyond a reasonable doubt." (Appellant's Br. 25 (citing Jackson v. Virginia, 443 U.S. 307, 319, reh'g denied, 444 U.S. 896 (1979))). The appellant contends that "absent copious other conspiracy evidence which was injected by the Government, the transcript of the trial proceeding in the instant case reveals that the evidence ... provided an insufficient basis to justify a rational trier of the facts to find guilt beyond a reasonable doubt...." (Appellant's Br. 24). Testimony clearly established that Abusayed arranged leased space and phone service in Wilmington. He supervised the operation and was seen at the operation site by witnesses. He signed leases and arranged for phone service in his fictitious name and failed to pay the bill. Other crime evidence admitted under 404(b) showed that he was engaged in an ongoing scheme to defraud the long distance carriers in this manner. Ample evidence existed from which a reasonable jury could find guilt beyond a reasonable doubt.
 
 
 34
 Lastly, Abusayed argues that the government fatally varied its proof from the charged crimes. The appellant cites Kotteakos v. United States, 328 U.S. 750 (1945), and similar cases for the proposition that a defendant cannot be prejudiced by evidence of other crimes which were not connected to the crime charged and were separately peopled. Abusayed alleges that his activities in St. Louis and Chicago were such evidence. Abusayed's activities were in no way like the evidence proffered in Kotteakos and United States v. Goss, 329 F.2d 180 (4th Cir. 1964). The incidents in St. Louis and Chicago were, with respect to Abusayed, identically peopled, and they were specifically tied to the operation at Wilmington by their similarity and by proof of Abusayed's having set up all the operations. In addition, they were specifically relevant to this case, as discussed above, to show intent and common plan.
 
 
 35
 The other evidence was appropriately related to the charged crime and was not in the nature of the disconnected incidents in Kotteakos and Goss. As such, it was correctly admissible and the government did not fatally vary its proof from the charged crimes.
 
 V
 
 36
 Finding that a new trial was properly denied, that the 404(b) evidence was admissible, and that the evidence used to convict Abusayed was both relevant to the crime charged and sufficient to support his conviction, we affirm the decision of the district court.
 
 AFFIRMED